## Case No. 3,027.

### The COLONEL LEDYARD.

[1 Spr. 530.] [1]

District Court, D. Massachusetts. Nov., 1860.

LIABILITY OF CARRIER FOR INJURY TO CARGO — CUSTOM AND USAGE—DUTY OF SHIPPER — MEASURE OF DAMAGES.

1. A general ship at New Orleans, took 354 barrels of flour for Boston, and also took on board 190 barrels of spirits of turpentine, the effluvium from which injured the flour: *Held*, that the carrier was responsible.

2. If he had shown an established usage to carry those articles, as parts of the same cargo, on such a voyage, he would have been exonerated.

3. It is incumbent on the shipper to see that his goods are of such character and condition, as to bear the ordinary and usual treatment of such articles, in the voyage on which he sends them.

4. The measure of damages is the difference between the fair market value of the flour, as delivered to the consignee, and what would have been its fair market value, if it had not been injured.

In admiralty.

A. A. Ranney, for libellants, cited Gillespie v. Thompson, cited on page 477, 6 El. & Bl. note; Brousseau v. The Hudson, 11 La. Ann. 427; Alston v. Herring, 11 Exch. 822; Baxter v. Leland [Case No. 1,124]; 1 Blatchf. 526 [Baxter v. Leland, Case No. 1,125]; Clark v. Barnwell, 12 How. [53 U. S.] 273.

Mr. Peabody, for claimants, cited Nettleton v. The Fanny Fosdick, decided by Judge Betts, in New York, and the same case [Case No. 4,641], decided by Judge Nelson, in the circuit court in New York.

SPRAGUE, District Judge. This libel, in rem, seeks to recover for damage done to a quantity of flour, by the effluvium of spirits of turpentine. In June, 1859, this vessel was at New Orleans, taking freight for Boston, as a general ship. The libellants, on the 24th of that month, put on board of her 354 barrels of sound flour, and took a bill of lading, by which the carrier was bound to deliver the same to the libellants at Boston, in like good order as when received, "the dangers of navigation and fire only excepted." The flour was stowed between decks, aft. There were 190 barrels of spirits of turpentine in the forward part of the lower hold. The cargo seems to have been, in

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

other respects, properly stowed, and the hatches of the lower hold well secured; and during the passage, the hatches of the upper deck were taken off during the daytime, for ventilation. On arriving at Boston, the flour was found to have been penetrated by the effluvium of the spirits of turpentine, and its market value thereby diminished.

It is not contended, on behalf of the claimants, that this damage arose from the perils of navigation, or of fire, so as to come within the exception in the bill of lading. But it is insisted, that there is an established usage to take spirits of turpentine and breadstuffs together, as portions of the cargo of a general ship, from New Orleans and elsewhere, and that, in this instance, the carrier took all proper care, and performed his whole duty. It is incumbent upon the shipper, to see that his goods are of such a character, and in such condition, that they will bear the voyage upon which he sends them, if conducted in the usual and accustomed manner. If, therefore, his goods are deteriorated, because they will not bear the established mode of stowage, or the companionship of other articles, which, from the known usage of trade, he may reasonably suppose may constitute a part of the cargo, the shipper must bear the loss, and not the carrier. If, therefore, the claimants had succeeded in proving the usage which they set up, it would have been a good defence; but their proof has wholly failed. The evidence does not show that it has been usual, on any voyages, to take spirits of turpentine, and breadstuffs, as parts of the same cargo, and as to New Orleans, it is but recently that spirits of turpentine have been shipped from that port, in any manner. The carrier has not shown any usage which would warrant him in putting spirits of turpentine on board of his vessel, with the flour, if the former would be deleterious to the latter, and the evidence shows conclusively that it was.

The numerous witnesses for the libellant testified positively that the flour was injured by the spirits of turpentine, and the scientific witness called for the claimant, on that point, rather confirmed than impaired their testimony. The flour having been damaged on the voyage, and it not appearing to have arisen from any inherent principle of decay, or from its character or condition being such as not to bear the voyage, as usually conducted, nor from the danger of the seas, the carrier must be responsible.

The only question remaining is, the amount of damages to be awarded. This vessel arrived in Boston in the latter part of July, and soon after began unloading. This injury to the flour was discovered as it came out of the vessel. It was piled on the wharf, and the libellants informed the carrier that it would be sold at auction, and that he would be held responsible for the loss; it was sold at auction, on the 29th of July. The libellants now claim the difference be-

tween the price thus obtained, and what would have been the fair market price of the flour, if it had been delivered to them uninjured. This auction sale was in every way properly conducted. Due previous notice was given. There was a good company of dealers, and the ship's husband himself was present. The prices obtained were better than the previous appraisal by experts, who had examined the flour for the purpose.

The claimants have proved that the purchaser at this sale subsequently sold the flour for more than he gave; but it was by retailing it, one, two, or three barrels at a time, and in one instance, ten barrels, and to persons who were kept in ignorance of its damaged condition. Such a sale does not furnish a criterion by which the court can be guided. The claimants also introduced the testimony of Dr. Hayes, an eminent chemist. He testified, that such was the volatile character of spirits of turpentine, and so pervading its effluvium, that it might injuriously affect this flour, in the relative situation in which they were on board of this vessel, and with the hatches between decks well secured; that he had been making experiments for the last six weeks, to ascertain, for his own instruction, the effect of spirits of turpentine on flour; that there was no chemical affinity between them, but that the flour absorbed the fumes; that this mixture was not injurious to health; that the effluvium might be removed by sifting the flour in the open air, or subjecting it to a dry heat of 150 degrees, or sometimes, at least, in the process of making and baking it into bread. I did not understand him to say that this would always be successful; and it is in proof, that bread made of this flour, had the taste of turpentine.

This scientific evidence undoubtedly shows, that the effect of spirits of turpentine upon flour, is less injurious than has generally been supposed, and that it may be removed by care and labor. But if all this were, in fact, known at the time this flour arrived, still, the necessity of bestowing this care and labor, in order to relieve it from impurity, and restore it to its sound condition, would materially detract from its value. But it does not appear, that the facts stated by Dr. Hayes were known, even to him, until demonstrated by his experiments, within the last six weeks. The importer was entitled to have this flour delivered to him in as good condition, for his wholesale business, as it was when put on board of the vessel at New Orleans. It was not so delivered, and the carrier is responsible for the deterioration. The measure of damages must be the difference between its market value and the price it would have commanded, if it had arrived in a sound condition. From all the evidence, it appears that the auction sale is satisfactory proof of the market value. The testimony of experts has clearly shown, what it would have been worth, if it had arrived uninjured; and the difference is the amount of damages to be awarded.

Decree for $567.42, damages and costs.

See Lamb v. Parkman [Case No. 8,020].